IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ALI AMIRNAZMI, : CIVIL NO. 3:11-CV- 273
 :
 Petitioner, : (Judge Nealon)
 :
 v. :
 : (Magistrate Judge Carlson)
WILLIAM SCISM, :
 :
 Respondent. :

## REPORT AND RECOMMENDATION

### I. Introduction

In this multi-faceted federal habeas corpus petition, the petitioner: (1) invites us to examine the results of a series of prison disciplinary hearings; (2) calls upon us to answer questions regarding the application of the Second Chance Act, a 2008 federal statute designed to provide prison officials with greater discretion in assisting inmates in making the transition back into society by permitting prison officials to place inmates in Residential Re-entry Centers up to 12 months before they are released from custody; and (3) demands that we assess the fairness of a prison decision denying Amirnazmi an opportunity to participate in a Residential Drug Abuse Program (RDAP).

Having conducted this review, for the reasons set forth below it is recommended that Amirnazmi's petition be denied for two reasons. First, as to some of the claims advanced by Amirnazmi, dismissal of the petition is appropriate because Amirnazmi has failed to exhaust his administrative remedies prior to proceeding into federal court. Moreover, in our view, a review of the merits of Amirnazmi's complaints reveals that the decisions made by prison officials in his case comported with the requirements prescribed by law. Accordingly, aside from its procedural shortcomings, Amirnazmi's petition fails on its merits.

## II.    Statement of Facts and of the Case

### A.    Ali Amirnazmi.

Ali Amirnazmi is a federal inmate in his mid-60s who was sentenced on January 11, 2010, in the United States District Court for the Eastern District of Pennsylvania, to 48 months of imprisonment for conspiracy to violate the international emergency economic powers act; violation of the international emergency economic powers act; statements to government officials, and bank fraud in violation of 18 U.S.C. § 371; 18 U.S.C. § 1001; and 18 U.S.C. § 1344. (Doc. 11, Manthey Decl. Ex. 1 ¶ 2.) Amirnazmi has been incarcerated at Low Security Correctional Institution-Allenwood since March 15, 2010, and his projected release is January 24, 2012. (Id. ¶ 3.)

### B.   Amirnazmi's Disciplinary History at LSCI Allenwood.

In the course of his federal incarceration Amirnazmi has been cited several times for prison disciplinary infractions. Three of these infractions are now the subject of allegations made by Amirnazmi in his current federal habeas petition. With respect to these three disciplinary citations, the pertinent facts are as follows:

The first of these disciplinary citations occurred on May 2, 2010, when Amirnazmi was cited for refusing to obey an order. Specifically, it was alleged that Amirnazmi violated an order previously given to him directing him to refrain from leaving his legal materials strewn about in an inmate common area, the reading room. (Doc. 11, Albert Decl. Ex. 2 ¶ 10; Attach. 3.) Amirnazmi was given advanced written notice of the charges on May 2, 2010, at 7:10 p.m. (Id.) At this time Amirnazmi was also informed of his right to remain silent. (Id.)

This incident report was then referred to the Unit Disciplinary Committee ("UDC") for further action. (Id.) Amirnazmi appeared at the UDC for a hearing in this matter on May 4, 2010, at 9:17 a.m. (Id.) Following this hearing, Amirnazmi was sanctioned with 30 days loss of telephone privileges, which was suspended for 180 days pending clear conduct. (Id. ¶ 12.) The Unit Disciplinary Committee advised Amirnazmi of their findings and that he had a right to appeal this disciplinary action within 15 calendar days. (Id.)

3

Within a few hours of the completion of this first disciplinary hearing, at 12:40 p.m. on May 4, 2010, Amirnazmi incurred another citation for being in an unauthorized area. Specifically, it was alleged that Amirnazmi had left his area in the housing unit during an inmate census count without approval. (Doc. 11, Albert Decl. Ex. 2 ¶ 13; Attach 4.) Amirnazmi was, once again, given advance written notice of the charges on the afternoon of May 4, 2010, (id.), and was informed of his right to remain silent. (Id.)

This second incident report was also referred to the UDC for further action. (Id.) On May 6, 2010, at 9:40 a.m. a UDC hearing was conducted on this disciplinary infraction. (Id. ¶ 14.) At this hearing Amirnazmi was, once again, informed of his administrative rights, including his right to remain silent, his right to staff assistance, his right to present evidence, and his right to appeal any adverse disciplinary findings. (Id.) During this hearing, Amirnazmi contested the violation, stating that he had attempted to go to his unit for the census count, but the door was locked. (Id.)

Despite this denial, the UDC recommended that Amirnazmi be sanctioned and have his phone and email privileges suspended. (Id.) Due to Amirnazmi's past disciplinary history, the UDC then referred his charges to a Discipline Hearing Officer ("DHO") for further review. (Id.) On May 4, 2010, Amirnazmi was advised of this UDC decision and was given a copy of the "Notice of Discipline Hearing" and the

"Duties of Staff Representative" form, which outlined his rights in this disciplinary setting. Amirnazmi requested a staff representative, and one was appointed to assist him in this matter. (<u>Id</u>.) Thus, Amirnazmi received notice of the charges against him prior to his appearance before the DHO,  (<u>Id</u>.) and a prison staff member was assigned as Amirnazmi's staff representative at this DHO hearing. (<u>Id</u>.)

On June 10, 2010, at 10:20 a.m., a DHO hearing was held regarding this particular infraction. (Doc. 11, Albert Decl. Ex. 2 ¶ 15; Attach. 4.) At this hearing, Amirnazmi had the assistance of a staff representative, and given the opportunity to make a statement and respond to the allegations set forth in the incident report. (<u>Id</u>.) Amirnazmi took full advantage of this opportunity and provided an explanation, stating that he had not heard the announcement of a census count because he was wearing earplugs. (<u>Id</u>.)  At the close of the hearing, however, the DHO found that Amirnazmi had committed this infraction, finding that it was undisputed that Amirnazmi was out of bounds at the time of the census count, and further noting that Amirnazmi's statements indicated that he had been aware of the impending census count when he had left the housing area. (<u>Id</u>.) Having made these findings, the DHO sanctioned Amirnazmi with two (2) months' loss of commissary privileges and 15 days' disciplinary segregation, which was suspended pending 180 days of clear conduct. (<u>Id</u>.)

Less than one month later, on June 3, 2010, Amirnazmi incurred a third incident report for refusing to obey an order, insolence toward staff, and interfering with the taking of count. (Id., Albert Decl. Ex. 2 ¶ 16; Attach. 5.) This third disciplinary incident involved an episode on June 3, when prison staff were conducting an inmate count and had instructed all prisoners to stand, look directly at the correctional officer so he could observe and confirm their identities, and identify themselves by name and inmate number. (Id.) According to the incident report, Amirnazmi had initially refused to fully comply with these instructions, hiding his face from view and declining to identify himself, until the correctional officer repeated his orders several times. After this exchange Amirnazmi allegedly exacerbated the situation by referring to a prison staff member as an "asshole."(Id.) Amirnazmi was given advanced written notice of the charges on June 3, 2011, at 7:00 p.m., (id.), and was once again advised of his administrative rights in this disciplinary setting. (Id.) In response to this citation, Amirnazmi stated, that he was unaware that he had to face the officer during count, denied the charges of using profanity, and said that the officer told him to "shut up." (Id.) This incident report was then referred to the UDC for further action. (Id.)

A UDC hearing was held on June 9, 2010, at 9:52 a.m. Amirnazmi appeared at this hearing and denied the charges. (Id.) At the UDC hearing it was recommended that one charge–insolence–be expunged but that Amirnazmi be sanctioned for failing

to obey orders and interfering with an inmate count. The specific proposed sanction was that Amirnazmi's phone and commissary privileges suspended for 30 days, and that he receive 15 days of disciplinary segregation. (Id.)

Due to Amirnazmi's past disciplinary history, the UDC referred his charges to the DHO for further proceedings. (Id.) At the time of this decision, Amirnazmi was given a copy of the "Notice of Discipline Hearing" and the "Duties of Staff Representative" form which further outlined Amirnazmi's rights and repsonsibilities in this setting. (Id.) Amirnazmi, in fact, actively exercised these rights, seeking out witnesses for the DHO hearing and requesting that a staff representative, assist him at the DHO proceeding. (Id.)

On July 23, 2010, at 9:45 a.m., a DHO hearing was held regarding these latest alleged infractions. (Id. ¶ 18.) In the course of these disciplinary proceedings: (1) Amirnazmi received advance notice of the charges against him; (2) Amirnazmi was offered and elected to have staff representation at this hearing; (3) Amirnazmi was given the opportunity to make a statement regarding this matter; and (4) Amirnazmi was permitted to call witnesses. (Id.) At the close of this hearing, the DHO found that Amirnazmi had committed the prohibited acts of failing to obey an order, and interfering with a count. In reaching this conclusion the DHO found the correctional officer's account of these events more credible than Amirnazmi's, and concluded that

the equivocal evidence presented by Amirnazmi's witnesses, did not support Amirnazmi's defense. Indeed, the DHO report reflects that even Amirnazmi's inmate-witnesses related that Amirnazmi failed to promptly obey staff instructions on June 3, 2010. Having made these findings, the DHO sanctioned Amirnazmi for these infractions by imposing a penalty of 15 days of disciplinary segregation, 2 months' loss of telephone privileges, and 7 days' loss of good conduct time. (Id.)

**C.    Amirnazmi's Complaints Regarding His Request to Participate in a Residential Drug Abuse Program.**

In addition to challenging these disciplinary decisions, in his current habeas corpus petition, Amirnazmi seeks to attack a prison decision not to permit him to participate in a residential drug abuse program. With respect to this allegation, the pertinent facts can be simply stated:

This particular complaint arises against a statutory and regulatory backdrop of prison programs designed to aid inmates with drug abuse problems. As part of this statutory scheme, 18 U.S.C. § 3621 directs the Bureau of Prisons to "make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse." 18 U.S.C. § 3621(b). Under 18 U.S.C. § 3621, eligible prisoners are able to participate in substance abuse programming and treatment available while incarcerated in federal institutions. 18 U.S.C. § 3621(b)(5), (e). An inmate may be "eligible" for a program such as the

RDAP if he is (1) "determined by the Bureau of Prisons to have a substance abuse problem," and (2) "willing to participate in a residential substance abuse treatment program." 18 U.S.C. § 3621(e)(5)(B). As "an incentive . . . to draw into treatment many inmates who may otherwise not be willing to undergo a difficult and painful treatment program," Congress allowed for a potential one-year sentence reduction upon successful completion of the RDAP, at the discretion of prison officials. 18 U.S.C. § 3621(e)(2)(A), (B). The incentive provision in § 3621states as follows:

> The period a prisoner convicted of a nonviolent offense remains in custody after successfully completing a treatment program *may* be reduced by the Bureau of Prisons, but such reduction may not be more than one year from the term the prisoner must otherwise serve.

18 U.S.C. §3621(e)(emphasis added).

Because space in these programs is limited, the Bureau of Prisons as a matter of policy and regulation, sets several prerequisites for admission to RDAP programs. First, the Bureau of Prisons limits program participation to inmates with well-documented histories of drug abuse, and typically looks to the inmates' pre-sentence report for documentation of long-standing substance abuse issues. In addition, because of the prolonged nature of the RDAP program, participation in the program is typically restricted to inmates who have undischarged sentences of 24 months or more.

In the spring of 2010, Amirnazmi requested to participate in the RDAP program. On April 12, 2010, Amirnazmi, was interviewed for eligibility in that

program. (Doc. 11, declaration of Susan Albert Ex. 2 ¶ 3; Attach. 1.) As a result of this interview and assessment process, it was determined that Amirnazmi was not eligible for participation in this particular program. This determination was based upon two factors: First, Amirnazmi's history as reflected in his pre-sentence report lacked any extensive documentation of substance abuse. (Id.) In addition, it was also noted that Amirnazmi was 22 months from his release date at the time of his requested interview, a release time frame which fell below the 24-month minimum incarceration period typically called for by the Bureau of Prisons for participants in the RDAP program. (Id.)

D.    **Amirnazmi's Complaints Regarding the Prison's Decisions Concerning His of Residential Re-entry Center (RRC) Placement.**

Finally, in this petition Amirnazmi protests the actions taken by prison officials with respect to his participation in a Residential Re-entry Center (RRC) program. Like Amirnazmi's concerns regarding his enrollment in residential drug programs, these complaints arise against a statutory and regulatory backdrop governing these institutional programs and resources. In April of 2008, the Second Chance Act of 2007, Pub. L. No. 110-199, went into effect. This act contains several provisions which were designed to aid prisoners in their transition back into society. For example, the Act authorized the Bureau of Prisons to place certain inmates in Residential Re-

entry Centers (RRC) for as much as one year at the end of their prison terms to aid them in their readjustment into society. See 18 U.S.C. § 3624(c)(1).[1] While Amirnazmi has been in federal custody the Bureau of Prisons has adopted a series of policies, practices and procedures which govern inmate placement and custody. (Doc. 11, Manthey declaration Ex.1, attach. 1-6.)  These policies, in part, speak to the issue of

---

[1]18 U.S.C. § 3624(c) provides as follows:

**( c ) Prerelease custody.**–

**(1) In general.**--The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility.

**(2) Home confinement authority.**--The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months.

**(3) Assistance.**--The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during prerelease custody under this subsection.

**(4) No limitations.**--Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621

18 U.S.C. § 3624 (c).

Residential Re-entry Centers (RRC) placements of inmates in the year prior to their release dates. These prison policies specifically directed that as a result of the Second Chance Act: (1) RRC placements were increased to a maximum of twelve months; (2) RRC placement determinations are to be made on an individualized basis using the criteria set forth at 18 U.S.C. §3621(b);   and (3) sentencing court orders, recommendations or requests directing an inmate's placement in an RRC were not binding on the Bureau of Prisons. (Id. ¶ 5; Attach. 2.)

The Bureau of Prisons policies governing implementation of the Act further specifically instructed prison staff that all "inmates must now be reviewed for pre-release RRC placements 17-19 months before their projected release dates," and the memorandum sets forth the five factors under 18 U.S.C. § 3621(b) which must be considered when determining RRC placement dates. (Id.) With respect to this advice, the memorandum stated, "the Act requires staff to ensure that each pre-release RRC placement decision is 'of sufficient duration to provide the greatest likelihood of successful reintegration into the community.' See 18 U.S.C. § 3624(c)(6)(C) (amended). This means Bureau Staff must approach every individual inmate's assessment with the understanding that he/she is now eligible for a maximum of 12 months pre-release RRC placement. Provisions in PS [(Program Statement)] 7310.04

that reflect any other possible maximum time frame must be ignored." (Id., Manthey Decl. Ex. 1 ¶ 5; Attach. 2.)

On June 24, 2010, a revised guidance memorandum was disseminated to provide BOP staff with new guidance on RRC placements. (Id. ¶ 13; Attach. 5.) In this memorandum, staff were reminded that "all" inmates are statutorily eligible for up to 12 months pre-release RRC placement. However, the memorandum further stipulated that not all inmates are appropriate for RRC placement, and for those inmates who are appropriate, the length of the RRC placement must be determined on an individual basis. (Id.) In addition, the memorandum stipulates that RRC's are most effective, in terms of recidivism reduction, for inmates who are at higher risks. (Id.)

It is against this statutory, regulatory and administrative background that prison officials considered an RRC placement for Ali Amirnazmi. That consideration began late in 2010. On December 2, 2010, Amirnazmi was recommended and approved for RRC placement of 91-120 days. (Doc. 11, Manthey Decl. Ex. 1 ¶ 11; Attach. 4.) This recommended RRC placement time-frame was based on the five statutory factors contained in 18 U.S.C. § 3621, and reflected an individualized application of those factors to Amirnazmi's case. (Id. ¶ 9.) Thus, in the course of reaching this recommendation prison staff specifically considered Amirnazmi's institutional programming and adjustment, his high education level, his prior disciplinary record,

his prior criminal record, work history, secured residency, and circumstances of his current offense. (Id.) The recommendation was then specifically tailored to factors unique to Amirnazmi, and took into account the fact that he has family support, had secured residency with his cousin, possessed a post graduate degree with extensive work experience, incurred a relatively short sentence, had an extended disciplinary history, was not indigent, and had completed his release programming. (Id.)  This RRC placement recommendation further noted that Amirnazmi's primary objective while housed at the RRC was the need to secure employment and to reconnect with his family. (Id. ¶ 12.) Following this recommendation an RRC placement decision was made for Amirnazmi. Presently, Amirnazmi has been approved for a 120-day RRC placement at the Luzerne Community Corrections Center in Philadelphia. He will transfer to this facility on September 27, 2011. (Id. ¶ 11; Attach. 4.)

### E. **Bureau of Prisons Grievance Procedures and Amirnazmi's Administrative Efforts To Challenge This RRC Placement Decision**.

With respect to inmate concerns regarding prison discipline, RRC placements, enrollment in drug treatment programs and other matters, the Bureau of Prisons has adopted a three-tiered administrative remedy procedure with respect to inmate complaints which is set forth at 28 C.F.R. § 542.10, et seq. As part of this grievance process, inmates should first present their complaints to staff, and  staff are obliged

14

to attempt to informally resolve any issues before an inmate files a formal request for Administrative Remedy. Id. at § 542.13(a). At the second stage of this process, if an inmate is unable to informally resolve his complaint, the inmate may file a formal written complaint to the Warden, on the appropriate form within twenty (20) calendar days of the date on which the events which form the basis for the complaint took place. Id. at § 542.14(a). If the inmate's concern is not addressed to the inmate's satisfaction by the Warden's response, the inmate may then file an appeal to the Regional Director within twenty (20) calendar days. Id. at § 542.15(a). Finally, if the inmate is dissatisfied with the Regional Director's response, that decision may then be appealed to the General Counsel (Central Office) within thirty (30) calendar days from the date of the Regional Director's response. Id. The Regional Director then has thirty (30) calendar days to respond and the General Counsel has forty (40) calendar days to address the inmate's concern. Id. at § 542.18.

As these regulations state: "The purpose of the Administrative Remedy Program is to allow an inmate to seek formal review of an issue relating to any aspect of his/her own imprisonment." 28 C.F.R. § 542.10(a). Under this grievance process: "If an inmate raises an issue in a request or appeal that cannot be resolved through the Administrative Remedy Program, the Bureau will refer the inmate to the appropriate statutorily-mandated procedures." Id. at § 542.10 (c). Furthermore, under these

procedures, no administrative remedy appeal is considered to have been fully exhausted until decided by the Central Office. 28 C.F.R. § 542, et seq.

In this case Amirnazmi has followed an erratic, halting and uneven course in challenging the various prison actions now which form the basis of this multi-faceted habeas corpus petition. Amirnazmi has filed a total of 16 administrative remedies, all of which have involved appealing UDC or DHO sanctions, with the exception of four, which raised issues concerning his RRC placement. (Doc. 11, Albert Decl. Ex. 2 ¶ ¶ 22, 23; Attach. 6.) Thus, Amirnazmi has exhausted his administrative remedies with respect to his appeal of these disciplinary incident reports; however, he has failed to exhaust these remedies on the issue of his RRC placement, and the denial of his enrollment in the RDAP program. (Doc.11, Albert Decl. Ex. 2 ¶ 22; Attach. 6.)

Indeed, there is no record that Amirnazmi ever sought in any fashion to administratively appeal the decision denying him admission into the RDAP program. Further, with respect to the prison's RRC placement decision, Amirnazmi's efforts to appeal this decision were incomplete at the time of the filing of this habeas petition. Specifically, on September 28, 2010, Amirnazmi filed an administrative remedy requesting additional RRC time, which was denied on October 8, 2010.(Id. ¶ 24; Attach. 7.) On October 19, 2010, Amirnazmi filed an administrative appeal, which was denied on November 19, 2010. (Id.) On December 16, 2010, Amirnazmi filed an

administrative remedy appeal of this decision, which was rejected on January 13, 2011. (Id.) On January 25, 2011, Amirnazmi then filed a second administrative remedy appeal, which was pending a response at the time that Amirnazmi filed the instant habeas petition. (Id.)

### F.    Amirnazmi's Habeas Petition

On February 8, 2011, Amirnazmi filed this petition for writ of habeas corpus. (Doc. 1.) In his petition Amirnazmi: (1) challenges the results of the prison disciplinary hearings which led to the forfeiture of good time for this federal prisoner; (2) attacks the prison's exercise under the Second Chance Act, with respect to his placement in a Residential Re-entry Center; and (3) urges us to reassess the fairness of a prison decision denying Amirnazmi an opportunity to participate in a Residential Drug Abuse Program (RDAP). These issues have been fully briefed by the parties (Docs. 1, 11 and 15) and are now ripe for disposition. For the reasons set forth below, it is recommended that the petition be denied..

### III.   Discussion

### A.    The Exhaustion Doctrine Bars Consideration of Amirnazmi's Complaints Regarding His RRC Placement and the Denial of His Admission into the RDAP Program in This Habeas Petition.

In our view, with respect to Amirnazmi's complaints regarding his RRC placement and the failure of prison officials to enroll this inmate in the drug rehabilitation program, this petition suffers from a fundamental procedural flaw, since the petitioner failed to properly exhaust his administrative remedies within the federal prison system. Although 28 U.S.C. § 2241 contains no express exhaustion requirement, "[o]rdinarily, federal prisoners are required to exhaust their administrative remedies prior to seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2241." Gambino v. Morris, 134 F.3d 156, 171 (3d Cir.1998); see also, e.g., Callwood v. Enos, 230 F.3d 627, 634 (3d Cir.2000); Bradshaw v. Carlson, 682 F.2d 1050, 1052 (3d Cir.1981). These exhaustion rules serve an important and salutary purpose. The United States Court of Appeals for the Third Circuit requires administrative exhaustion of a claim raised under § 2241 for three reasons:  "(1) allowing the appropriate agency to develop a factual record and apply its expertise facilitates judicial review; (2) permitting agencies to grant the relief requested conserves judicial resources; and (3) providing agencies the opportunity to correct their own errors fosters administrative autonomy." Moscato v. Federal Bureau of Prisons, 98 F.3d 757, 761-62 (3d Cir.1996); see also Gambino, 134 F.3d at 171; Lyons v. U.S. Marshals, 840 F.2d 202, 205 (3d Cir.1988).

In this case, it is undisputed that Amirnazmi did not exhaust his administrative remedies with respect to either of these claims prior to filing this petition in federal court. Indeed, there is no record that Amirnazmi ever sought in any fashion to administratively appeal the decision denying him admission into the RDAP program, and, with respect to the RRC placement decision, Amirnazmi's efforts to appeal this decision were incomplete at the time of the filing of this habeas petition. It is well-settled that, when considering habeas claims like those presented by here, which seek placement in a residential setting under the Second Chance Act:

> Courts in the Middle District of Pennsylvania have consistently held that "exhaustion of administrative remedies is not rendered futile simply because a prisoner anticipates he will be unsuccessful in his administrative appeals before the twelve-month pre-release mark, which is simply a statutory maximum and not a mandate." See Malvestuto v. Martinez, 2009 U.S. Dist. LEXIS 78231, *9 (M.D.Pa. Sept. 1, 2009) (Conner, J.); Melchiorre v. Martinez, 2009 U.S. Dist. LEXIS 91137, *7 (M.D.Pa. Sept. 30, 2009) (Conner, J.); D'Alfonoso v. Martinez, 2009 U.S. Dist. LEXIS 90344, *6 (M.D.Pa. Sept. 30, 2009) (Conner, J.); Torres v. Martinez, 2009 U.S. Dist. LEXIS 70577 (M.D.Pa. Aug. 12, 2009) (Munley, J.); Miceli v. Martinez, 2009 U.S. Dist. LEXIS 71877 (M.D.Pa. Sep. 15, 2008) (Rambo, J.)

Ross v. Martinez, No. 09-1770, 2009 WL 4573686, 3 (M.D.Pa. Dec. 1, 2009). Rigorously applying these exhaustion requirements, this Court has consistently rejected habeas petitions like Amirnazmi's where inmates have failed to fully exhaust their administrative remedies prior to proceeding in federal court. See, e.g., Biscula

19

v. Schism, No. 09-2552, 2010 WL 1805394 (M.D.Pa. May 5, 2010); McCooey v. Martinez, No. 09-1533, 2010 WL 411744 (M.D.Pa. Jan. 25, 2010); Lacy-Thompson v. Martinez, No. 09-1320, 2009 WL 4823875 (M.D. Pa. Dec. 14, 2009); Ferris v. Holt, No. 09-1465, 2009 WL 3260557 (M.D. Pa. Oct. 8, 2009); Drummond v. Martinez, No. 09-1258, 2009 WL 3241851 (M.D. Pa. Oct. 5, 2009).   As Judge Rambo has previously explained when dismissing such a habeas petition challenging an RRC placement decision for failure to exhaust administrative remedies:

> In order for a federal prisoner to exhaust his administrative remedies, he must comply with 28 C.F.R. § 542. *See* 28 C.F.R. § 542.10, et seq. ; Lindsay v. Williamson, No. 1:CV-07-0808, 2007 WL 2155544, at *2 (M.D.Pa. July 26, 2007). An inmate first must informally present his complaint to staff, and staff shall attempt to informally resolve any issue before an inmate files a request for administrative relief. 28 C.F.R. § 542.13(a). If unsuccessful at informal resolution, the inmate may raise his complaint with the warden of the institution where he is confined. 28 C.F.R. § 542.14(a). If dissatisfied with the response, he may then appeal an adverse decision to the Regional Office and the Central Office of the BOP. 28 C.F.R. §§ 542.15(a), 542.18. No administrative appeal is considered finally exhausted until a decision is reached on the merits by the BOP's Central Office. See Sharpe v. Costello, No. 08-1811, 2008 WL 2736782, at *3 (3d Cir. July 15, 2008).

Miceli v. Martinez, No. 08-1380, 2008 WL 4279887, 2 (M.D.Pa. Sept. 15, 2008)

It is no defense for Amirnazmi to argue that he eventually exhausted some of his administrative remedies while this petition was pending. Administrative exhaustion is a prerequisite to filing an action in federal court, and the exhaustion

requirement is not satisfied if an inmate concurrently files administrative grievances while litigating claims in court. See Ghana v. Holland, 226 F.3d 175 (3d Cir. 2000)(administrative exhaustion required prior to filing lawsuit). Because Amirnazmi did not fully exhaust his available administrative relief regarding the failure to consider him for the RDAP program or the timing of his community placement under the Second Chance Act, and has not shown that the failure in pursuing administrative relief should be excused, this Court should, as a threshold matter,  dismiss these claims in this petition for failure to exhaust administrative remedies.  See also, Lindsay v. Williamson, 271 F. App'x. 158, 160 (3d Cir. 2008);Craig v. Zickefoose, No. 09-6513, 2010 WL 234908 (D.N.J. Jan. 15, 2010); Shoup v. Schultz, No. 09-0585, 2009 WL 1544664, at *4 (D.N.J. June 2, 2009); Breazeale v. Shultz, No. 09-2118, 2009 WL 1438236 (D.N.J. May 19, 2009).

## B.   **This Petition Fails on Its Merits**

### 1.   **Amirnazmi's Claims Concerning His RRC Placement are Meritless**.

In any event, Amirnazmi's claims fail on their merits. For example, at the outset, with respect to Amirnazmi's complaints concerning his RRC placement, we conclude that the petitioner has not carried his burden of establishing that this discretionary decision by the Bureau of Prisons violated any rights guaranteed to Amirnazmi by the

Constitution or laws of the United States. Therefore, we recommend that this petition be denied on its merits.

At the outset, it is clear that Amirnazmi's petition does not raise any concerns of a Constitutional dimension. Nor can Amirnazmi rely upon Constitutional concerns to challenge this RRC placement decision since it is well established that the United States Constitution does not confer any right upon an inmate to any particular custody or security classification. Moody v. Daggett, 429 U.S. 78, 88 (1976); Montanye v. Haymes, 427 U.S. 236, 242 (1976). Thus, inmates do not have a liberty interest in retaining or receiving any particular security or custody status "[a]s long as the [challenged] conditions or degree of confinement is within the sentence imposed ... and is not otherwise violative of the Constitution." Id.

Similarly, it has long been recognized that the mere fact of a prison transfer, standing alone, does not constitute cruel and unusual punishment in violation of the Eighth Amendment to the Constitution. See, e.g., Hassain v. Johnson, 790 F.2d 1420 (9th Cir. 1986); Serrano v. Torres, 764 F.2d 47 (1st Cir. 1985). Thus, even inmate transfers to facilities far from their homes do not rise to the level of cruel and unusual punishment. See, e.g., Gov't of Virgin Island v. Gereau, 592 F.2d 192 (3d Cir. 1979)(transfer from Virgin Islands to mainland); Rodriguez-Sandoval v. United States, 409 F.2d 529 (1st Cir. 1969)(transfer from Puerto Rico to Atlanta). In short, well-

settled law establishes that prisoners have no inherent constitutional right to placement in any particular prison, such as a Residential Re-entry Center, to any security classification, or to any particular housing assignment. See Olim v. Wakinekona, 461 U.S. 238, 245 (1983); Meachum v. Fano, 427 U.S. 215 225 (1976); Montanye, 427 U.S. at 242; Bulger v. U.S. Bureau of Prisons, 65 F.3d 48 (5thCir. 1995); Marchesani v. McCune, 531 F.2d 459 (10th Cir.1976).

Rather, Amirnazmi's sole avenue for substantive relief lies through the Second Chance Act itself. With respect to habeas claims premised on the Act, as we have noted, in April of 2008, the Second Chance Act of 2007, Pub. L. No. 110-199, went into effect. The Act contains several provisions which are designed to aid prisoners in their transition back into society. For example, the Act authorizes the Bureau of Prisons to place certain inmates in Residential Re-entry Centers for up to one year at the end of their prison terms to aid their readjustment into society. See 18 U.S.C. § 3624(c)(1).[2]

_____

[2]18 U.S.C. § 3624(c) provides as follows:

**( c ) Prerelease custody.**–

**(1) In general.**--The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility.

While the Act promotes policies assisting inmates in reintegration into society, nothing in the Act is mandatory, and the Act does not compel the Bureau of Prisons to provide any particular inmate with a specific community confinement or home detention placement. Quite the contrary, the statutory text makes it clear that prison officials retain their broad discretion in placing, housing, transferring and classifying inmates.  Thus, 18 U.S.C. § 3624(c)(4) clearly states that the Act in no way restricts the broad discretion conferred upon the Bureau of Prisons under 18 U.S.C. § 3621 to make decisions on how best to house inmates, providing that: "Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621". Section 3621, in turn, broadly reaffirms the

---

**(2) Home confinement authority.**--The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months.

**(3) Assistance.**--The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during prerelease custody under this subsection.

**(4) No limitations.**--Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621

18 U.S.C. § 3624(c).

discretion of prison officials in this field to make appropriate prison placement decisions based upon five statutory factors set forth in 18 U.S.C. § 3621(b).[3] Similarly, while the Second Chance Act amended 42 U.S.C. § 17541 to encourage the Bureau of Prisons to examine early release and social re-integration for certain offenders, the Act expressly reaffirms that decisions relating to which offenders may

---

[3] 18 U.S.C. § 3621(b) provides:

(b) Place of imprisonment.--The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering-

(1) the resources of the facility contemplated;
(2) the nature and circumstances of the offense;
(3) the history and characteristics of the prisoner;
(4) any statement by the court that imposed the sentence--
 (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
 (B) recommending a type of penal or correctional facility as appropriate; and
(5) any pertinent policy statement issued by the Sentencing Commission pursuant to Section 994(a)(2) of title 28 . . . Any order, recommendation, or request by a sentencing court that a convicted person serve a term of imprisonment in a community corrections facility shall have no binding effect on the authority of the Bureau under this section to determine or change the place of imprisonment of that person.

qualify for the program involve assessments that rest in the sound discretion of the Bureau of Prisons. See 42 U.S.C. §§ 17541(a)(2) and (g)(5).

Indeed, as it relates to inmate community confinement decisions, the Second Chance Act speaks directly to the discretion retained by the Bureau of Prisons in 18 U.S.C. § 3624(c)(1) which provides as follows:

> **( c ) Prerelease custody.**–
>
> **(1) In general.**--The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions *may* include a community correctional facility.

18 U.S.C. § 3624(c)(1)(emphasis added.)

The use of the word "may" in § 3624(c), has led courts to consistently hold that the Act creates no absolute, enforceable legal right to a 12- month RRC placement for any prisoner. See, e.g., O'Hara v. Rios, No. 08-5160, 2009 U.S. Dist. LEXIS 90243 (D. Minn. Sept. 28, 2009); McGee v. Thomas, No. 09-455, 2009 U.S. Dist. LEXIS 62617 (D. Ore. July 22, 2009). Rather, what is required by the Act is a showing that the Bureau of Prisons engaged in an individualized determination of each inmate's RRC placement, using the statutory factors set forth in the law. Smith v. Sanders, No. 09-3083, 2009 U.S. Dist. LEXIS 82265 (C.D. Cal. July 31, 2009).

Moreover, in considering whether the Bureau of Prisons has properly exercised its broad discretion in this field, over the past year courts have frequently examined the Bureau of Prisons policy statements implementing the Act. These policies statements note that many inmates can be successfully re-integrated into society in 180 days or less. Much recent litigation in this field has focused on the issue of whether this policy guidance violates the Second Chance Act by creating unwarranted institutional and bureaucratic obstacles to 12-month RRC placements. As to this issue, the majority view, reflected in numerous trial court opinions, and in the only appellate court decision to have considered this issue, holds that the agency's stated view that many inmates can have their needs meet through short-term RRC placements, do not violate the Act. See,e.g., Miller v. Whitehead, 527 F.3d 752,755-58 (8thCir. 2008); Wires v. Bledsoe, No. 09-2247, 2010 WL 427769 (M.D.Pa. Feb. 3, 2010)(citing Torres v. Martinez, No. 09-CV-1070 (M.D.Pa. Aug.12, 2009)); Fleischi v. Outlaw, No. 09-79, 2009 U.S.Dist. LEXIS 99306 (E.D. Ark. Oct. 26, 2009); O'Hara v. Rios, No. 08-5160, 2009 U.S. Dist. LEXIS 90243 (D. Minn. Sept. 28, 2009); Holland v. Bureau of Prisons, No. 08-3960, 2009 WL 2872835 (D.S.C. Sept. 2, 2009);  Smith v. Sanders, No. 09-3083, 2009 U.S. Dist. LEXIS 82265 (C.D. Cal. July 31, 2009); Yanucci v. Stansberry, No. 08-561, 2009 WL 2421546 (E.D.Va. July 28, 2009); McGee v. Thomas, No. 09-455, 2009 U.S. Dist. LEXIS 62617 (D. Ore. July 22, 2009);

Sessel v. Outlaw, No. 08-212, 2009 WL 1850331 (E.D. Ark. June 25, 2009); Stanko v. Rios, No. 08-4991, 2009 WL 1303969 (D. Minn. May 8, 2009); Somerville v. DeWalt, No. 09-68, 2009 U.S.Dist. LEXIS 37454 (E.D. Ky. May 1, 2009); Snyder v. Angelini, No. 07-3073, 2008 U.S. Dist. LEXIS 86460 (E.D.N.Y. Oct. 27, 2008). This view has been adopted by numerous courts in this district. See, e.g., Ogman v. Ebbert No. 10-1342, 2010 WL 4922889, 3 (M.D.Pa. Nov. 12, 2010); Collins v. Martinez, No. 09-2454, 2010 WL 4272923 (M.D.Pa. October 25, 2010); Berlin v. Bledsoe, 2010 WL 3528571 (M.D.Pa. September 8, 2010) Cullum v. Bledsoe, Civil No. 09-2385, 2010 WL 2521035 (M.D.Pa. Jun.15, 2010); Ramos v. Holt, 2010 WL 2471707 (M.D.Pa. May 5, 2010); McDonald v. Obama, 2010 WL 1526443 (M.D.Pa. March 14, 2010); Wires v. Bledsoe, No. 09-2247, 2010 WL 427769 (M.D.Pa. Feb. 3, 2010).

Recognizing the broad discretion expressly conferred to the Bureau of Prisons by statute, these cases consistently hold that the agency statements expressing an institutional view that short-term RRC placements are generally adequate for most inmates, do not violate the Act. Rather, these policies simply reflect the Bureau of Prisons' exercise of its discretion in implementing the Act, an Act which simply provides that prison officials "may" use community corrections facilities for up to 12 months to aid inmates in their return to society. Id. Therefore, these cases find nothing fundamentally offensive about these agency policy preferences, provided that each

inmate receives the individualized consideration of this RRC placement called for by the Act. Id. But see. Krueger v. Martinez, 665 F.Supp.2d. 477 (M.D. Pa. 2009); Strong v. Schultz, 599 F.Supp.2d 556 (D.N.J. 2009) (finding that: (1) the agency requirement of prior regional director approval for 12-month RCC placements; and (2) the agency's stated position that "inmates' pre-release RRC needs can usually be accommodated by a placement of six months or less", so restrict inmate access to the 12-month RRC programs permitted under the Second Chance Act that they constitute an abuse of discretion by the Bureau of Prisons.)

Indeed, adopting the view invited by Amirnazmi, which calls for a particularized analysis and assessment of the wisdom of Bureau of Prisons policy guidance in the area of RRC placements could draw the courts into an individualized assessment of each inmate's case against the five statutory factors, a result Congress could not have intended. Miller, 527 F.3d at 757. Moreover, many of these prison policies in this field are rationally related to institutional needs that are expressly delegated to the Bureau of Prisons. Further, to the extent that there is a need to engage in an overall assessment of how these policies are being implemented, the Second Chance Act clearly contemplates that this review will be done primarily through Congressional oversight. Therefore, all of these statutory considerations weigh in favor of the majority view expressed by the federal courts, which calls upon the courts

to limit judicial review in this field to making an independent assessment that the Bureau of Prisons engaged in an individualized determination of each inmate's placement, using the statutory factors set forth in the law.

Adopting this standard of review we believe that the record of these proceedings shows that Amirnazmi's request received individualized consideration at the prison. On December 2, 2010, Amirnazmi was recommended and approved for RRC placement of 91-120 days. (Doc. 11, Manthey Decl. Ex. 1 ¶ 11; Attach. 4.) The recommended RRC placement time-frame was based on the five statutory factors contained in 18 U.S.C. § 3621, and reflected an individualized application of those factors to Amirnazmi. (Id. ¶ 9.)  In the course of reaching this recommendation prison staff specifically considered Amirnazmi's institutional programming and adjustment, his education level, his disciplinary record, his prior criminal record, work history, secured residency, and circumstances of his current offense. (Id.)  This recommendation was specifically tailored to factors unique to Amirnazmi, and took into account the fact that he had family support, had secured residency with his cousin, possessed a post graduate degree with extensive work experience, incurred a relatively short sentence, had an extended disciplinary history, was not indigent, and had completed release programming. (Id.)  This RRC placement recommendation further noted that Amirnazmi's primary objective while housed at the RRC was to secure

employment and to reconnect with his family. (Id. ¶ 12.)  Therefore, an assessment of the RRC placement decision in this case leads in the firm conviction that this decision represented an individualized assessment of the needs of this prisoner, which is all that the law requires, and all that an inmate can demand.

> ### 2.   <u>Amirnazmi's Challenges to His Prison Disciplinary Hearings Also Fail</u>.

In this habeas petition Amirnazmi also launches a two-fold constitutional assault upon various prison disciplinary decisions, challenging these disciplinary processes generally on procedural due process grounds, and asserting that these decisions were substantively flawed since there was insufficient evidence to support the findings of misconduct on his part. Amirnazmi faces an exacting burden of proof in advancing these two constitutional claims.  First, with respect to his procedural due process concerns, it is well established that "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply."  <u>Wolff v. McDonnell</u>, 418 U.S. 539, 556 (1974). The Supreme Court has, however, recognized a set of minimum procedural protections that must apply to prison disciplinary proceedings, including the right to: (1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety or correctional goals, to call witnesses and present documentary

evidence as part of a defense; and (3) a written statement by the fact finder of the evidence relied on and the reasons for the disciplinary action. Id. at 563-67.

Due process also requires that a prison disciplinary tribunal be sufficiently impartial.   Meyers v Alldredge, 492 F.2d 296, 305-07 (3d Cir. 1974).    The requirement of an impartial tribunal "prohibits only those officials who have a direct personal or otherwise substantial involvement, such as major participation in a judgmental or decision-making role, in the circumstances underlying the charge from sitting on the disciplinary committee." Meyers, 492 F.2d at 306.  In the past, inmates have often invited courts to set aside disciplinary hearing results based upon general assertions of staff bias. Yet, such requests, while frequently made, have rarely been embraced by the courts. Instead, the courts have held that a "generalized critique" of staff impartiality is insufficient to demonstrate the degree of bias necessary to prove a due process violation. Lasko v. Holt, 334 F. App'x 474 (3d Cir. 2009). Furthermore, in the absence of a showing that the hearing officer was "personally or substantially involved in the circumstances underlying [the investigation of the] charge," Greer v. Hogston,  288 F. App'x. 797, 799 (3d Cir. 2008), courts generally decline to strike down disciplinary decisions on claims of staff bias. See Redding v. Holt, 252 F. App'x 488 (3d Cir. 2007).

In the federal prison system, the Bureau of Prisons has, by regulation, adopted specific guidelines for inmate discipline procedures which are set forth at 28 C.F.R. §541.10 et seq. These guidelines are specifically tailored and designed to meet the due process requirements outlined by the Supreme Court in Wolff. See Von Kahl v. Brennan, 855 F. Supp. 1413 (M.D. Pa. 1994). Under these regulations, when prison staff have reason to believe that a prohibited act has been committed by an inmate, an incident report must be prepared and referred for investigation. 28 C.F.R. §541.14. After investigation, the incident report is referred to a Unit Discipline Committee (UDC) for an initial hearing. 28 C.F.R. §541.15. The inmate, in turn, is entitled to notice of any proposed violation. The UDC may either reach a finding regarding whether a prohibited act was committed, or refer the case to the Discipline Hearing Officer (DHO) for further hearing. 28 C.F.R. §541.15(f). The DHO then has the authority to dismiss any charge, to find a prohibited act was committed, and to impose any available sanction for the act. 28 C.F.R. §541.18. The DHO hearing is conducted pursuant to the procedures set forth at 28 C.F.R. §541.17.

Throughout this hearing process the inmate is provided with a series of procedural rights. For example, the inmate is entitled to notice of the alleged infraction. Specifically, the Warden must give the inmate advance written notice of the charges no less than 24 hours before the DHO hearing. 28 C.F.R. §541.17(a). The

inmate is also entitled to assistance at DHO hearings. In particular, the Warden must provide the inmate with a full-time staff member to represent him at the DHO hearing. 28 C.F.R. §541.17(b).

The inmate also has a series of procedural rights at the hearing itself. Thus, at the DHO hearing, the inmate is entitled to make a statement and present documentary evidence. The inmate also has the right to submit names of requested witnesses and have them called to testify and to present documents. While the DHO need not call repetitive witnesses or adverse witnesses, 28 C.F.R. §541.17(c), the DHO shall call those witnesses who have information directly relevant to the charges and who are reasonably available. The inmate has the right to be present throughout the DHO hearing except during deliberation or when institutional security would be jeopardized. 28 C.F.R. §541.17(d).

In addition, the regulations prescribe procedural standards for DHO decision-making. Thus, the regulations require that the DHO must consider all evidence presented at the hearing. The decision of the DHO must be based on the facts presented, and if there is conflicting evidence, it must be based on the greater weight of the evidence. 28 C.F.R. §541.17(f). Finally, the DHO must prepare a record of the proceedings. This record must be sufficient to document the advisement of inmate rights, the DHO's findings, the DHO's decision and the specific evidence relied upon

by the DHO. The record must include a brief statement of the reasons for the sanction imposed. A copy of this record must be delivered to the inmate, ordinarily within 10 days of the hearing. 28 C.F.R. §541.17(g).

Given the panoply of procedural protections afforded to inmates by these regulations, courts have consistently held that when prison officials comply with these regulations they fully satisfy the requirements of procedural due process in this prison disciplinary setting. See, e.g., Fiore v. Lindsay, 336 F. App'x 168 (3d Cir. 2009)(upholding disciplinary decision); Macia v. Williamson, 219 F. App'x 229 (3d Cir. 2007)(same); Reynolds v. Williamson, 197 F. App'x 196 (3d Cir. 2006)(same); Levi v. Holt, 193 F. App'x 172 (3d Cir. 2006)(same); Sinde v. Gerlinski, 252 F. Supp. 2d 144 (M.D.Pa. 2003)(same).

In his habeas petition, Amirnazmi also attacks the substance of several disciplinary decisions, arguing that there was insufficient evidence to support the findings of misconduct on his part. Like his procedural due process challenge, this substantive attack on the sufficiency of the evidence in these disciplinary hearings must meet a demanding legal standard to succeed. A prison disciplinary determination comports with due process if it is based on "some evidence." See Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 454-56 (1985) ("[T]he relevant question is whether there is any evidence in the record that could support the conclusion reached

35

by the disciplinary board"). This standard is minimal and does not require examination of the entire record, an independent assessment of the credibility of witnesses, or even a weighing of the evidence. See id. at 455; Thompson v. Owens, 889 F.2d 500, 501-02 (3d Cir. 1989). Therefore, it is well settled that the decisions of a DHO are entitled to considerable deference by a reviewing court and must be upheld whenever there is "some evidence" to support these decisions. Hill, 472 U.S. at 457; Elkin v. Fauver, 969 F.2d 48 (3d Cir.1992); Thompson v. Owens, 889 F.2d 500 (3d Cir. 1989); Franco v. Kelly, 854 F.2d 584, 588 (2d Cir. 1988); Freeman v. Rideout, 808 F.2d 949, 955 (2d Cir. 1986).

Thus, in this setting the "function [of the court] is to determine whether there is some evidence which supports the decision of the [DHO]." Freeman, 808 F.2d at 954. As the Supreme Court has observed, the "some evidence" standard is a highly deferential standard of review and:

> Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.

Hill, 472 U.S. at 455-456.

Applying this deferential standard, once the reviewing court determines there is "some evidence" to support the finding of the DHO, the court must reject the evidentiary

36

challenge by the petitioner and uphold the finding of the DHO. <u>Griffin v. Spratt</u>, 969 F.2d 16, 22 (3d Cir. 1992); <u>Thompson</u>, 889 F.2d 501; <u>Freeman</u>, 826 F.2d at 954. In practice, courts have rarely condemned correctional disciplinary decisions as being wholly lacking in evidentiary support, and have frequently concluded that disciplinary findings are supported by the requisite degree of proof . <u>See, e.g.</u>, <u>Fiore v. Lindsay</u>, 336 F. App'x 168 (3d Cir. 2009)(upholding disciplinary decision); <u>Macia v. Williamson</u>, 219 F. App'x 229 (3d Cir. 2007)(same); <u>Reynolds v. Williamson</u>, 197 F. App'x 196 (3d Cir. 2006)(same); <u>Levi v. Holt</u>, 193 F. App'x 172 (3d Cir. 2006)(same); <u>Sinde v. Gerlinski</u>, 252 F. Supp. 2d 144 (M.D.Pa. 2003)(same).

Judged against these standards, Amirnazmi's procedural and substantive challenges to these prison disciplinary proceedings simply fail. First, with respect to Amirnazmi's procedural due process claims, in this case it is evident that this prisoner's due process rights were fully vindicated.  In each instance Amirnazmi received advance, written notice of the proposed disciplinary charges against him. Moreover, he was notified on multiple occasions of his procedural due process rights, including his right to have staff assistance and to request witnesses. Indeed, Amirnazmi frequently either exercised those rights, or expressly waived the rights he had in connection with these disciplinary hearings. Furthermore, once the hearings were concluded prison officials scrupulously complied with prison regulations, and

afforded Amirnazmi his due process rights, by providing him with written decisions outlining the basis of their actions, and describing his appellate rights.

As for Amirnazmi's complaints regarding the fairness of the DHO proceedings, the petitioner offers little to support these claims beyond a "generalized critique" of staff impartiality, which is as a legal matter insufficient to demonstrate the degree of bias necessary to prove a due process violation. Lasko v. Holt, 334 F. App'x 474 (3d Cir. 2009). Thus, the record of these disciplinary proceedings affirmatively reveals that– contrary to his claims–Amirnazmi was given all of the procedural protections that due process requires in this setting since he was afforded: (1) advance written notice of the disciplinary charges; (2) an opportunity to call witnesses and present documentary evidence as part of a defense; and (3) a written statement by the fact finder of the evidence relied on and the reasons for the disciplinary action. Wolff v. McDonnell, 418 U.S. at 563-67. Given the full array of procedural rights provided to the petitioner during these proceedings, his procedural due process claim fails. See e.g., Fiore v. Lindsay, 336 F. App'x 168 (3d Cir. 2009)(upholding disciplinary decision); Macia v. Williamson, 219 F. App'x 229 (3d Cir. 2007)(same); Reynolds v. Williamson, 197 F. App'x 196 (3d Cir. 2006)(same); Levi v. Holt, 193 F. App'x 172 (3d Cir. 2006)(same); Sinde v. Gerlinski, 252 F. Supp. 2d 144 (M.D.Pa. 2003)(same).

Nor can Amirnazmi successfully challenge the substantive outcome of these DHO hearings, since it is apparent that these decisions were adequately supported by "some evidence" in the record. Indeed, with respect to this issue, the DHO decisions entailed the most basic of fact-finding determinations: an assessment of witness credibility. In this regard, it is evident that the statements made by Amirnazmi consistently acknowledged commission of the prohibited acts, while denying commission of these acts with any intent to violate prison rules. On the issue of Amirnazmi's intent, the factual determinations by the DHO are consistent with the evidence, and fully supported the DHO's decision to credit the correctional officer's description of these episodes over Amirnazmi's self-serving accounts. Therefore, this proof clearly constituted substantial evidence establishing Amirnazmi's responsibility for these various infractions. Accordingly, on these facts, we conclude that there was some evidence to support these disciplinary findings. Since there is an adequate factual basis for these disciplinary findings, the petitioner's substantive challenge to these disciplinary actions should also be rejected. See e.g., Fiore v. Lindsay, 336 F. App'x 168 (3d Cir. 2009)(upholding disciplinary decision); Macia v. Williamson, 219 F. App'x 229 (3d Cir. 2007)(same); Reynolds v. Williamson, 197 F. App'x 196 (3d Cir. 2006)(same); Levi v. Holt, 193 F. App'x 172 (3d Cir. 2006)(same); Sinde v. Gerlinski, 252 F. Supp. 2d 144 (M.D.Pa. 2003)(same).

### 3.    Amirnazmi May Not Successfully Challenge the Decision to Deny Him Enrollment in the RDAP Program In This Petition.

Finally, in this petition Amirnazmi challenges the decision of prison officials to refrain from enrolling him in a prison Residential Drug Abuse Program (RDAP). Like his other habeas claims, this contention is also unavailing. At the outset, this claim fails because Amirnazmi has never exhausted his administrative remedies with respect to this contention, as he is required to do.

But beyond these procedural shortcomings, Amirnazmi's habeas challlenge to this decision not to enroll him in the RDAP program fails on its merits.  As we have noted, this particular complaint arises in the context of a prison program designed to aid inmates with severe drug abuse problems. As part of this statutory scheme, 18 U.S.C. § 3621directs the Bureau of Prisons to "make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse." 18 U.S.C. § 3621(b).Under  18 U.S.C. § 3621, eligible prisoners are able to participate in substance abuse programming and treatment available while incarcerated in federal institutions. 18 U.S.C. § 3621(b)(5), (e). As "an incentive . . . to draw into treatment many inmates who may otherwise not be willing to undergo a difficult and painful treatment program," Congress allowed for a potential one-year sentence reduction upon successful completion of the RDAP, at the

discretion of prison officials. 18 U.S.C. § 3621(e)(2)(A), (B). The incentive provision

in § 3621 states as follows:

> The period a prisoner convicted of a nonviolent offense remains in custody after successfully completing a treatment program may be reduced by the Bureau of Prisons, but such reduction may not be more than one year from the term the prisoner must otherwise serve.

18 U.S.C. § 3621(e)(2)(B).

Yet, plainly enrollment in this program, and receipt of these benefits,  is

something consigned to the sound discretion of the Bureau of Prisons. Because space

in these programs is limited, the Bureau of Prisons as a matter of policy and

regulation, sets several prerequisites for admission to RDAP programs. First, the

Bureau of Prisons limits program participation to inmates with well-documented

histories of drug abuse, and typically looks to the inmates' pre-sentence report for

documentation of long-standing substance abuse issues. In addition, because of the

prolonged nature of the RDAP program, participation in these programs is typically

restricted to inmates who have undischarged sentences of 24 months or more.

When Amirnazmi requested to participate in the RDAP program in the spring

of 2010, he was interviewed for eligibility in that program and it was determined that

Amirnazmi was not eligible for participation in this particular program for two

reasons: First, Amirnazmi's history as reflected in his pre-sentence report lacked any

extensive documentation of substance abuse. (Id.) In addition, it was also noted that Amirnazmi was 22 months from his release date at the time of his requested interview, a release time frame which fell below the 24 month minimum incarceration period typically called for by the Bureau of Prisons for participants in the RDAP program. (Id.) While Amirnazmi argues that the Bureau of Prisons erred in its assessment of his substance abuse history, he does not dispute that his undischarged term of imprisonment falls below the general program parameters for admission into the RDAP program.

On these undisputed facts, Amirnazmi's habeas claims relating to enrollment in this program are without merit. Indeed, we note that claims, like those made by Amirnazmi, challenging RDAP enrollment decisions in habeas corpus petitions, while frequently made, are rarely embraced by the courts. Giannini v. Federal Bureau of Prisons, No. 06-1166, 2010 WL 1427318 (D.Minn. Feb. 12, 2010)(collecting cases). Instead, noting the broad language of the statute in terms of the discretion of prison officials in making decisions regarding enrollment in the RDAP program, courts have held that: "There is no other language in the statute addressing the eligibility of prisoners for participation in RDAP, thus suggesting that *Congress has granted BOP broad discretion in administering RDAP*. Cf. Lopez v. Davis, 531 U.S. 230 (2001) (upholding BOP regulation that categorically excludes from early release

consideration those RDAP participants who had possessed a firearm in connection with a nonviolent offense because statute limits such consideration to "prisoner[s] convicted of ... nonviolent offense[s]"). Goren v. Apker. No. 05-9006,  2006 WL 1062904, *5 (S.D.N.Y. April 20, 2006)(emphasis added). Therefore, reasoning that "there is no constitutional right to rehabilitation. See Marshall v. United States, 414 U.S. 417 (1974)(in context of drug addiction, there is no fundamental right to rehabilitation after conviction) [courts have held that a] Petitioner cannot demonstrate a violation of his constitutional rights by the conduct of the BOP [when making enrollment decisions in the RDAP program]." Kokoski v. Felts, 06-849,  2007 WL 2821085, *6 (S.D.W.Va. Sept. 27, 2007). Instead, it has been consistently held that in the absence of a showing that the Bureau of Prisons' decision was "arbitrary, capricious, or an abuse of discretion", Wells v. Rivera, No. 06-137, 2007 WL 4219002, *8 (N.D.Fla. Nov. 28, 2007), or "[a]bsent an allegation that the BOP violated established federal law, the United States Constitution, or exceeded the its statutory authority in making the determination that Petitioner was ineligible for RDAP, the Court does not have jurisdiction to review Petitioner's claim." Johnston v. Thomas,  2010 WL 2574090, *6 (D.Or. June 24, 2010).

Amirnazmi has made no such showing here, nor can he. Quite the contrary, the evidence reveals that the decision to refrain from enrolling Amirnazmi in the RDAP

43

program was a discretionary one based upon valid and facially neutral factors, including the undisputed fact that the remaining term of Amirnazmi's imprisonemnt was of insufficient duration to allow him to fully benefit from this prorgam. Since this decision is not "arbitrary, capricious, or an abuse of discretion", <u>Wells v. Rivera</u>, No. 06-137, 2007 WL 4219002, *8 (N.D.Fla. Nov. 28, 2007), and did not "violate[] established federal law, the United States Constitution, or exceed[] [the Bureau of Prisons']s statutory authority in making the determination that Petitioner was ineligible for RDAP, the Court does not have jurisdiction to review Petitioner's claim." <u>Johnston v. Thomas</u>, 2010 WL 2574090, 6 (D.Or. June 24, 2010). Therefore, this claim should also be denied.

## IV.   <u>Recommendation</u>

Accordingly, for the foregoing reasons, upon consideration of this Petition for Writ of Habeas Corpus, IT IS RECOMMENDED that the Petition be DENIED, and that a certificate of appealability should not issue. The petitioner is further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed

findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may  accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 5th day of May, 2011.

_**S/Martin C. Carlson**_
Martin C. Carlson
United States Magistrate Judge